GEORGE CHURCH, Appellant, *v.* ARTHUR M. WICKWIRE and Others, Respondents.

First Department, January 9, 1931.

*Clifton P. Williamson* of counsel [*Edward W. Bourne* with him on the brief], for the appellant.

*Edward T. McLaughlin* of counsel [*James P. Callender* with him on the brief; *Guggenheimer, Untermyer & Marshall*, attorneys], for the respondent Arthur M. Wickwire.

*Truman H. Luhrman* of counsel [*Loren N. Wood* with him on the brief; *Wood, Molloy & France*, attorneys], for the respondents Henry T. Sheldon and Kenneth H. Sheldon.

MARTIN, J. The correctness of the judgment dismissing the complaint at the close of the plaintiff's case is challenged by the plaintiff. The action was brought to recover damages alleged to have been sustained through the fraud and deceit of the defendants in persuading the plaintiff to pay the sum of $8,400 on or about December 10, 1923, for so-called first mortgage bonds of the Cumberland Coal and Iron Company. When the payment was made plaintiff received interim certificates purporting to entitle him to first mortgage bonds of the face value of $10,000 and in addition he received as a bonus $10,000 par value common stock of the company.

The plaintiff sets forth in his complaint that the defendant Kenneth H. Sheldon, acting as agent for the defendants Arthur M. Wickwire, Henry T. Sheldon and the company, fraudulently represented to him certain facts upon which he relied in making the aforesaid purchase.

The defendant Arthur M. Wickwire was president and a director of the Cumberland Coal and Iron Company, and the defendant Henry T. Sheldon was treasurer and a director. Both Mr. Wickwire and Mr. Sheldon were substantial stockholders and both were creditors of the corporation. They appear to have been chiefly instrumental in bringing out the issue of the so-called first mortgage

bonds of the Cumberland Coal and Iron Company and were two of the four members of the syndicate which contracted to dispose of the bonds and in addition they underwrote a part of the issue.

The plaintiff says he was persuaded to pay over his money by the defendant Kenneth H. Sheldon, a son of Henry T. Sheldon; that Kenneth H. Sheldon made false representations in order to induce the sale, and that the defendants delivered to plaintiff an interim certificate which had been prepared in such a form as to make it appear that plaintiff was receiving Cumberland Coal and Iron Company first mortgage bonds, whereas in fact he was not. There was an outstanding prior purchase-money lien and no arrangement made to discharge this prior lien. The plaintiff's money was mingled with the corporation's general funds and immediately used for purposes not shown by the record.

The Cumberland Coal and Iron Company was finally adjudicated a bankrupt. Its property realized, after administration expenses, less than a sufficient amount to pay the purchase-money lien or real first mortgage. The plaintiff never received a first mortgage bond, and lost his entire investment.

It is the contention of the plaintiff that the defendants knew and at all times intended that, although no provision had been made to discharge the purchase-money lien, his money should be used and he should be left with only an unsecured claim instead of a first mortgage bond. The interim certificate delivered to the plaintiff purported to represent part of an issue of bonds which the defendants Wickwire and Sheldon, as syndicate managers, had undertaken to dispose of; that it was part of the subscription of the defendant Henry T. Sheldon as an underwriter, and that the money paid by the plaintiff was turned over to the Cumberland Coal and Iron Company.

There is, therefore, a basis for a direct liability on the part of the defendant Henry T. Sheldon as the seller of the bonds through his agent Kenneth H. Sheldon, and a basis for liability on the part of the defendant Arthur M. Wickwire as a member of the syndicate which was disposing of the issue of bonds knowing that they were not first mortgage bonds.

The plaintiff's contention is that the defendants Arthur M. Wickwire and Henry T. Sheldon are liable as promoters of the company, whether the interim certificate was or was not a part of Mr. Sheldon's subscription, since they were the organizers of the company, its principal officers, its largest stockholders, two of its largest creditors, members of the syndicate and underwriters, and the persons who originated, prepared and carried out the plan or scheme for the issue of so-called first mortgage bonds, which were falsely desig-

nated as such; that the evidence shows that the defendants Wickwire and Sheldon were directly responsible for plaintiff's investment; that the issue of bonds and interim certificates was designed primarily to benefit them, and that they are liable under the principles laid down in a number of similar cases, regardless of the form of the sale.

Several excerpts from letters and a few quotations from the evidence will serve to show the part taken by each defendant. Kenneth H. Sheldon sent the plaintiff a letter on the letterhead of the Cumberland Coal and Iron Company in part as follows: " I have made arrangements through my father whereby you can obtain an allotment of around $25,000 worth of Cumberland Coal & Iron Company's Fifteen Year 7% Bonds."

By uncontradicted testimony the plaintiff established the fact that Kenneth Sheldon represented to him that the Cumberland Coal and Iron Company's bonds were first mortgage bonds.

The plaintiff's testimony is that Kenneth H. Sheldon said to him that he (plaintiff) " could have ten thousand dollars par value of the first mortgage bonds, and a bonus of common stock for eight thousand four hundred dollars. He said that the moneys received by the sale of these bonds would have to be used first to clean any liens on the property, and that it could not be used for any other purposes until the liens were removed. He said that the bonds were therefore, first mortgage bonds, and that I would be in the driver's seat. * * *

" He told me interim certificates would be issued for the first mortgage bonds until the bonds were prepared for delivery and that these interim certificates were just as good as the first mortgage bonds. * * * I told him I was not interested in any speculative investment but would consider a first mortgage bond, and he repeated these were first mortgage bonds."

The plaintiff also testified that Kenneth H. Sheldon told him that he had seen the underwriting agreement and that the bonds were therein stated to be first mortgage bonds.

On December 11, 1923, the defendant Henry T. Sheldon, as treasurer of the Cumberland Coal and Iron Company, wrote the plaintiff acknowledging receipt of the check for $8,400 and asking certain instructions about the delivery of an interim certificate therefor and a voting trust certificate for the shares of common stock which the plaintiff was to receive as a bonus. Two days later, on December 13, 1923, Mr. Sheldon wrote the plaintiff again, inclosing the interim certificate and two voting trust certificates and stated as follows: " I note the remarks in your letter that you think this is a very safe and sound proposition. You

can rest assured, George, that it is or you would not have been invited to join it."

The interim certificate stated as follows: " This is to certify that the bearer hereof is entitled to receive Ten Thousand and 00/100 Dollars ($10,000.00) face value of Cumberland Coal & Iron Company's bonds to be known as ' *Fifteen Year 7% First Mortgage Sinking Fund Gold Bonds* ' secured by mortgage on the property of said Company, dated as of November 1, 1923, as soon as said bonds are ready for delivery, on surrender of this Certificate.

" In Witness Whereof, Cumberland Coal & Iron Company has caused this Interim Certificate to be duly executed, and its corporate seal to be hereunto affixed, as of this 1st day of November, 1923.

" CUMBERLAND COAL & IRON COMPANY

" by HENRY S. SHELDON,

" *Treasurer.*"

The above certificate purported to entitle the bearer to receive $10,000 worth of the Cumberland Coal and Iron Company's bonds to be known as " *Fifteen Year 7% First Mortgage Sinking Fund Gold Bonds* " as soon as said bonds were ready for delivery. It is quite clear from an examination of the certificate that the plaintiff was justified in believing that he had only to await the printing of the definite bonds and that in the interim he was just as well protected as if he had the bond in hand.

The plaintiff contends that Mr. Wickwire, at all times, knew the condition of the company, both before and after the sale of the bonds. On June 9, 1926, Mr. Wickwire wrote as follows: " I enclose herewith a copy of the balance sheet as of March 31, 1926. This, of course, is confidential, as no financial data has been issued to the public."

The plaintiff says that the balance sheet was calculated to lead him to believe that he was amply protected, for it showed assets of $11,609,111.50 and liabilities, exclusive of capital stock and surplus, amounting to only $630,263.74, leaving a net worth of $10,978,847.76; that the balance sheet was grossly misleading inasmuch as properties which were carried upon the books at over $11,000,000 had been purchased for $280,000 at a bankruptcy sale in 1921 and realized only $165,000 when the Cumberland Coal and Iron Company went bankrupt in 1927.

It is charged by the plaintiff that the defendants Mr. Wickwire and Mr. Sheldon knew all the facts with reference to this corporation and in addition that, with knowledge of the facts, Mr. Wickwire not only prepared the purchase-money mortgage which was approved

by Mr. Sheldon as a director, but also prepared and approved the interim certificates which were also signed by Mr. Sheldon.

It is unnecessary to further recite the evidence produced by the plaintiff to establish the fraud, the agency of Kenneth H. Sheldon or the participation in the alleged fraud by the other defendants. The plaintiff was induced to part with his money through representations which were false and known to be false by at least two of the three defendants and represented to be true by the other defendant. All the defendants were responsible for the false representations which they made, and which they intended the plaintiff should rely upon in making the investment. They not only made the representations orally and through letters and other writings including the syndicate agreement and the interim certificates, but they were in possession of the facts which showed the true financial condition of the corporation.

In *Downey* v. *Finucane* (205 N. Y. 251) the court, speaking of a false prospectus, said (at p. 259): " If Fenn was the agent of these defendants as members of such syndicate his acts in furtherance of the enterprise and all that he did in reference to the prospectus must be deemed binding upon them. The promoter of a company, whether he be a director or not, who knowingly issues or sanctions the circulation of a false prospectus containing untrue statements of material facts naturally tending to mislead and to induce the public to purchase its stock or other securities is unquestionably responsible to those who are injured thereby. (*Morgan* v. *Skiddy*, 62 N. Y. 319.) Where there are a number of such promoters all the coadventurers are liable in damages for the fraud of an agent employed by them to effect the sale of the corporate securities without reference to their own moral guilt or innocence. (*Hornblower* v. *Crandall*, 7 Mo. App. 220; affd., 78 Mo. 581.) In the case cited it was said that where an associate in such an enterprise abstains from knowing and leaves the details to his companions while the illicit gains go to the common accounts his ignorance ought not to avail him. * * *

" It is enough to say as to this proposition that a fraudulent intent on the part of the author and publisher of the prospectus may be inferred from the falsity of the statements therein contained and that alone. (See *Meyer* v. *Amidon*, 23 Hun, 553.) "

In *Lehman-Charley* v. *Bartlett* (135 App. Div. 674, at p. 683) the court said: " It is settled in this State that a director who knowingly issues or sanctions the circulation of a false prospectus containing untrue statements of material facts, the natural tendency of which is to deceive and mislead the community and induce the public to purchase the stock, is responsible to those who are injured

thereby. (*Morgan* v. *Skiddy*, 62 N. Y. 319; *Brackett* v. *Griswold*, 112 id. 454; *Coursey* v. *Morton*, 132 id. 556; *Lambert* v. *Elmendorf*, 124 App. Div. 758.) "

With reference to the defendant Kenneth H. Sheldon, immunity is claimed because the plaintiff failed to show that he was aware of the falsity of the material facts which he represented to be true. That is not a defense.

This court in *Bystrom* v. *Villard* (175 App. Div. 433, at p. 436) said: " The respondent of course relies upon the general rule that scienter is one of the essential elements of such an action as the present, and hence argues that it is incumbent upon plaintiff to show not only that the representations were false in fact, but that respondent knew them to be false. That rule, however, is subject to some qualification. * * * In a recent case (*Hadcock* v. *Osmer*, 153 N. Y. 604, 608) the rule applicable to such a case is stated as follows: ' Where a party represents a material fact to be true to his personal knowledge, as distinguished from belief or opinion, when he does not know whether it is true or not, and it is actually untrue, he is guilty of falsehood, even if he believes it to be true, and if the statement is thus made with the intention that it shall be acted upon by another, who does so act upon it to his injury, the result is actionable fraud. (*Kountze* v. *Kennedy*, 147 N. Y. 124, 130; *Rothschild* v. *Mack*, 115 N. Y. 1, 7; *Marsh* v. *Falker*, 40 N. Y. 562, 573; *Bennett* v. *Judson*, 21 N. Y. 238; Addison on Torts, 1007*; 1 Bigelow on Fraud, 514.)'

" The necessity for careful accuracy of statement in cases like the present is even more pronounced when the person making the statement holds a position with regard to the matters concerning which the statement is made which imports or implies that he has exceptional knowledge on the subject." (See *Ottinger* v. *Bennett*, 144 App. Div. 525; 203 N. Y. 554; *Churchill* v. *St. George Development Co.*, 174 App. Div. 1, 6; *Lambert* v. *Elmendorf*, 124 id. 758.)

In *Chatham Furnace Co.* v. *Moffatt* (147 Mass. 403) a very good statement of the rule will be found: " * * * The charge of fraudulent intent, in an action for deceit, may be maintained by proof of a statement made, as of the party's own knowledge, which is false, provided the thing stated is not merely a matter of opinion, estimate or judgment, but is susceptible of actual knowledge; and in such case it is not necessary to make any further proof of an actual intent to deceive. The fraud consists in stating that the party knows the thing to exist, when he does not know it to exist; and if he does not know it to exist, he must ordinarily be deemed to know that he does not."

We must not overlook the fact that we are here dealing with a

judgment dismissing the complaint at the end of the plaintiff's case. The plaintiff has the right under such circumstances to invoke the rule that any inference to be drawn from the evidence must be in his favor. Irrespective of that rule, we are of the opinion that the plaintiff had made out a case when he rested and that the complaint should not have been dismissed. Of course, we do not know what the defendants may be able to establish if they decide to submit proof of the facts upon another trial.

Under the circumstances here disclosed, however, the judgment should be reversed and a new trial ordered, with costs to the appellant to abide the event.

DOWLING, P. J., MERRELL, O'MALLEY and SHERMAN, JJ., concur.

Judgment reversed and a new trial ordered, with costs to the appellant to abide the event.